Brenda L. PORTER, et al.

v.

Earlene A. HOFFMAN, et al.

Supreme Judicial Court of Maine.

Argued Feb. 1, 1991.
Decided April 11, 1991.

Patricia Nelson–Reade (orally), Mary El-
len Rogers, Verrill & Dana, Portland, for
plaintiffs.

Jeffrey W. Jones, Robert M. Knight
(orally), Bean, Jones & Warren, South Port-
land, for defendants.

Before ROBERTS, WATHEN,
GLASSMAN, CLIFFORD, COLLINS and
BRODY, JJ.

ROBERTS, Justice.

Brenda and Earle Porter appeal a judgment of the Cumberland County Probate Court (*Childs, J.*) denying their motion for revocation of adoption. Because we find that the statutory adoption procedures of 19 M.R.S.A. § 532 (1981 & Supp.1990) were adequately complied with and because we do not find that these procedures effect a denial of due process or equal protection, we affirm the decision of the Probate Court.

Brenda Porter and Earle Porter have been married for seven years. They are currently raising one child from their marriage and one child from Earle Porter's previous marriage. They are also the natural parents of the baby girl who is the subject of this proceeding. Earlene Hoffman is Earle Porter's older sister. She and her husband James have been married for over twenty years. Earlene is unable to bear children and the couple unsuccessfully attempted to adopt children before they adopted the Porters' baby.

Brenda Porter has an I.Q. of 68, classifying her as mildly retarded. Her cognitive disabilities make it difficult for her to project herself into the future and evaluate consequences of certain actions. Testimony at trial also showed her to be illiterate and to have a poor ability with basic mathematics. Though Brenda graduated from high school, she graduated at the age of 19 from a special education program. She is, however, able to do the family's shopping, adding up prices with the aid of a calculator and can drive, cook, plan meals and otherwise function normally.

In the spring of 1989 Brenda Porter became pregnant. She informed her husband and, aware of their difficult financial situation, suggested that they allow Earlene and James to adopt the baby. It appears that this was not the first time that Brenda had suggested such a plan. Brenda had exhibited concern over the years that Earlene had no children and had even discussed being a surrogate parent for the Hoffmans. Despite Earle's advice to the contrary, Brenda went to the Hoffmans with her idea of allowing them to adopt the baby. The

Hoffmans were receptive, but told her to think it over carefully before making a decision.

The two couples discussed many of the aspects of the proposed adoption including who might pay for medical bills, how to prevent feelings from being hurt and what type of custody might be best for all involved. Earle was hesitant about surrendering the child for adoption. He was worried about his wife changing her mind. Further, he did not like the idea of giving up one of their children. At a second discussion between the couples, Earle suggested that Brenda get some counselling, but both Brenda and the Hoffmans said that would not be necessary. Earle suggested a temporary custody arrangement to see if his wife could get used to the idea of living without their child, but the Hoffmans were not receptive to the idea and told the Porters that they wanted a final decision.

In late October, Earle had still not decided, but told his sister that, if she set up a meeting with a lawyer, he would be there. Earlene then contacted an attorney, but the Porters had decided that finances did not permit them to retain counsel for themselves. The testimony clearly indicates that the attorney informed the Porters of their right to get counsel and of the fact that he represented only the Hoffmans.

On November 27, the Porters and the Hoffmans met at the attorney's office to discuss the adoption. Earle seemed upset and inattentive throughout most of the discussion. Apparently Earle was angered by having been asked to drive an hour to the office and then being made to wait for an hour before meeting with the attorney. He said he did not understand why they had wasted his time only to give him the same explanation of the adoption procedure his sister had already given him. During the meeting, Earle was given the Consent of Non–Petitioning Parent forms and an explanation of what they were for. For some reason, however, all parties left the discussion feeling that these were "temporary custody papers" and that "something more" would have to be done before the

484

adoption would be final. Earle gave the papers to Earlene for safe keeping.

The baby was born on Christmas Day and that afternoon Earle called Earlene and asked her what name she had chosen for the baby. Earle also went over to Earlene's house and picked up the Consent of Non–Petitioning Parent papers. The following day Earle and Brenda had a notary witness their signatures on the forms. After the documents were notarized, they returned to the home of a friend of Earlene's where they met the Hoffmans and gave them the baby. They spent some time socializing with the Hoffmans, then returned home.

On January 2, the two couples met at the Probate Court. At that meeting, the Porters signed another paper and the Hoffmans, alone, went in and saw the judge. At about this time, Earlene told the Porters that, pursuant to the custom of the Probate Court, the adoption would become final 30 days after this court appearance.

In mid-January, Brenda fell into a deep depression. She told her sister and her nurse that she felt she had made a mistake and that she had been used. This depression was apparently triggered by the Hoffmans' refusal to allow Brenda to take the child out of their house to visit some of Brenda's relatives. Though Earle suspected that Brenda was upset as a result of having given up the baby, Brenda hardly spoke to him and Earle did not broach the subject. Apparently there was also some sort of an argument between Brenda and Earlene in January, and Earlene had threatened to move to Pittsburgh. After this, Brenda did not speak with the Hoffmans.

Brenda began taking steps to stop the finalization of the adoption in January, and she asked her nurse and her sister for help in the matter. Her nurse gave her the number of several lawyers and her sister made some inquiries to find out how to stop the procedure. Although Brenda had been told that the adoption would become finalized thirty days after January 2, she had difficulty connecting this to a specific date. Brenda called the Probate Court twice. The first time she was told to have her lawyer call and the second time that she should make an appointment to see the judge. She made one for February 14. Brenda finally told her husband on February 2 that she wanted the baby back. Earle told her that she was too late, that the adoption had become final that day. Unbeknownst to either of them, the actual finalization date of the adoption had been set for February 5. Meanwhile, Brenda never told the Hoffmans that she wanted the baby back, and despite contact between the couples in the succeeding months, the Hoffmans were not informed that the Porters wanted the baby back until they received a letter from the Porters' attorney in June.

The Porters' petition to revoke the adoption was heard in September 1990. At the conclusion of the hearing, the court found that "at the time the forms were executed, the [Porters] understood that if they did not come forward to indicate a withdrawal of consent within the thirty day period following the execution of the forms the adoption would be finally granted" and that the Porters had "not shown good cause for annulling the adoption granted on February 5, 1990."

## I.

The Porters argue that the Probate Court erroneously found that the Porters fully understood the Consent of Non–Petitioning Parent forms and thus the only intent the Probate court could have found was a general intent to proceed with the adoption. This general intent, they argue, does not meet the written consent standard required by the statute. We do not agree with this latter assertion.

Assuming the Porters did not understand that the documents constituted a sufficient *final* consent to the adoption, we do not agree that the written consent requirement was not satisfied. The statute itself makes no mention of a required level of understanding before a signature constitutes valid consent. It merely states that before any adoption is granted, "written consent" to the adoption must be given by "each of

the child's living parents." No one contests that the Porters signed the documents, and we find no evidence on the record that the Porters' signing of these documents resulted from fraud or coercion or undue influence on the part of the Hoffmans. Earle Porter clearly had plenty of time to read the document, and both he and his wife had an opportunity to ask an attorney questions about the consent forms. The mere fact that the Porters were unaware of the technical import of the documents because they chose not to become acquainted with them is not enough to negate the written consent required by section 532.

The Porters also argue that the constitutional command that waiver of one's constitutional and statutory rights must be a "free, deliberate and understanding foregoing of one's known rights" was not met. *Green v. State*, 245 A.2d 147, 149 (Me. 1968). This argument is inapt because the Porters offer no evidence that they did not understand their rights or that they would not have signed the documents had they been fully aware of the nature of those documents. Earle and Brenda Porter both testified that on December 26 and January 2 they fully intended to go through with the adoption, and their actions indicate that they were taking all steps necessary to bring about this conclusion. As a result, they cannot show harm actually suffered as a result of not understanding the documents at the time they signed them.

## II.

■ The Porters also argue that their consent was invalid because "acknowledgment" of consent requires more than mere acknowledgment of the execution of a document. Testimony of the notary who witnessed the Porters' signatures, revealed that though he did not remember witnessing the Porters' documents, it was his usual practice merely to ask for identification before witnessing signatures. Under the Porters' theory such acknowledgement was not enough to satisfy the consent requirement of section 532.

While section 532(5)(E) (Supp.1990) states that rather than give consent before a judge of probate, "[c]onsent may be acknowledged before a notary public," there is no case law indicating that this language requires the signatories to acknowledge an understanding of a document before the notary. For most adoptions, the Legislature has determined that an appearance before a judge of probate is required and "the judge shall ... make a determination that the consent is freely [and] knowledgeably given." 19 M.R.S.A. § 532(4) (1981). Section 532(5)(E), on the other hand requires only that "consent may be acknowledged before a notary public" if the adoption occurs between blood relations. This indicates a legislative choice that the safeguard of an in depth examination of the intent of the natural parents is not required in adoptions occurring between blood relations. As a result, we find no violation of section 532.

## III.

■ The Porters also argue that, although consent to the adoption is required after the baby is born, the Porters were forced to give their consent prior to the birth of the baby, thus invalidating their consent. The Porters rely heavily on the fact that Earlene pressured the Porters to make a decision and not change their minds and that Earle never was comfortable with the decision. Because this decision was agreed to by Earle and Brenda before the baby's birth, they argue that the consent was invalid as being given before the birth of the baby.

The Porters took numerous steps after the baby was born indicating that they still desired to go ahead with the adoption. Earlene testified that she informed Earle that the baby was his until he signed the papers. Moreover, the fact that the Porters knew that they had time to revoke the adoption further indicates that, after the baby's birth, the Porters were aware of their legal rights to bring a halt to the adoption proceedings but did not do so until it was too late. Although a consent given before the birth of a baby is subject to

revocation after the birth but before adoption, that was not the situation in this case. All of the legal steps necessary to effect consent were accomplished after the birth of the child. Pressure from the family not to change their mind and Earle's discomfort with the adoption does not negate the fact that they were aware of their legal right to refuse to consent after the baby was born.

## IV.

As noted above, section 532 creates two different statutory procedures for parents to consent to the adoption of their child. Section 532(4) states that parents of a child adopted by non-blood relatives must go before a judge of probate who will "fully explain the effect of that consent, and shall make a determination that the consent is freely [and] knowledgeably given." Section 532(5)(E) makes an exception to this rule for parents of a child to be adopted by blood relatives, allowing the adoption to proceed if consent is "acknowledged before a notary public, who is not an attorney nor a partner, associate nor an employee of an attorney for the adopting parents." The Porters contend that the different procedural protections created by section 532 impermissibly distinguish between natural parents on the basis of the adoptee's relation to the adoptive parents, and thus violate equal protection and due process guarantees in violation of the United States and Maine Constitutions. Although we agree with both parties that there is a fundamental liberty interest in maintaining family relationships, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *In re Charles Jason R., Jr.*, 572 A.2d 1080, 1081 (Me.1990), we find no constitutionally impermissible violation of that right effected by this statute.[1]

The equal protection guarantee of the fourteenth amendment does not take from states all power of classification. It does not prohibit or prevent classification provided the classification is reasonable for the purpose of the legislation. Generally a law will survive such scrutiny if the distinction it makes rationally furthers a legitimate state purpose. *Zobel v. Williams*, 457 U.S. 55, 60, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982). "But, if a fundamental personal right is involved or the categorization discriminates against a suspect class, then the difference is constitutionally defensible only if it furthers a compelling state interest." *Lambert v. Wentworth*, 423 A.2d 527, 532 (Me.1980). Specifically, the Porters argue that the distinction created by section 532(5)(E) prevented them from fully understanding the procedures necessary to halt the adoption.

The stated purposes of the Legislature in appending subsection (E) to section 532(5) was not only to simplify and expedite adoption proceedings involving family but also to safeguard the welfare of the child. In addition, the Legislature has provided in section 533 that the intervention of the Department of Human Services is not mandatory in cases where one of the petitioners for adoption of a minor child is a blood relative of the child. These distinct rules for intrafamilial adoption serve the compelling legislative purpose of safeguarding the welfare of the child. In adopting sections 532(5)(E) and 533, the Legislature has provided a less burdensome adoption process in order to allow certain children and their adoptive parents to quickly settle into a normal family relationship. We are satisfied that those changes were necessary to fulfill that compelling objective.

The Porters also argue that subsection 532(5)(E) denied them their right to procedural due process in the termination of their parental rights. Procedural due process imposes constraints on governmental decisions that deprive individuals of fundamental rights to liberty[2] or property within the meaning of the due process

---

**1.** For purposes of this argument, we assume, without deciding, that the voluntary adoption procedures require state action.

**2.** The U.S. Supreme Court has held that the right to a unitary family comes under the head-

ing of a liberty interest, *Santosky v. Kramer,* 455 U.S. at 753, 102 S.Ct. at 1394.

clause of the fourteenth amendment. When such rights are denied through state action, the United States Supreme Court has created a method of analysis whereby a court can balance three distinct factors:

[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through . the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). According to the Court "[t]he ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed ... to ensure fairness." *Id.* at 348, 96 S.Ct. at 909.

Although the Supreme Court has stated that "[i]n parental rights termination proceedings, the private interest affected is commanding," *Santosky v. Kramer,* 455 U.S. 745, 757–58, 102 S.Ct. 1388, 1396–97, 71 L.Ed.2d 599 (1982), there is a difference between cases where the removal of a child is involuntary and those cases where parents willingly give their child for adoption. In a case such as the one at bar, the Legislature has determined that, because of *prior* and expected ongoing contact between family members, an intrafamilial adoption greatly lessens the possibility of future deprivation of the parents' contact with their child. The State's interest in both the welfare of the child and judicial economy outweigh a marginal risk of "erroneous deprivation" of the fundamental liberty interest in maintaining parental rights in intra-family adoption cases.

The entry is:

Judgment affirmed.

All concurring.