JOHN E. HAYES, JR. AND CHERYL S. HAYES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hayes v. Commissioner
Docket Nos. 30609-81, 22632-82, 26776-82, 39901-85, 44701-85, 277-86, 30613-86, 34875-87, 34923-87
United States Tax Court
T.C. Memo 1994-491; 1994 Tax Ct. Memo LEXIS 493; 68 T.C.M. (CCH) 862; October 6, 1994, Filed G & H Trust v. United States, 1991 U.S. Dist. LEXIS 15858 (N.D. Ga., Oct. 22, 1991)
*493 Decisions will be entered under Rule 155. For petitioners: Philip H. Weener. For respondent: Eric B. Jorgensen. DAWSON, DINAN
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: In these consolidated cases respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Docket No. 30609-81
Addition to Tax
Year
Deficiency
Sec. 6653(b) 1976
$ 1,082,175
$ 541,087
1977
8,422
4,211
Docket No. 22632-82
Addition to Tax
Year
Deficiency
Sec. 6651(a)(1)
1978
$ 5,264.16
$ 789.62
Docket No. 26776-82
Addition to Tax
Year
Deficiency
Sec. 6653(b) 1978
$ 1,203,070
$ 601,535
Docket No. 39901-85
Addition to Tax
Year
Deficiency
Sec. 6653(b)
1979
$ 998,620
$ 449,310
1980
704,225
352,113
Docket No. 44701-85
Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1979
$ 114,703
$ 5,735
--
--
1980
113,581
5,679
--
--
1981
87,422
--
$ 4,371
[1]
*494 Docket No. 30613-86
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1982
$ 8,591
$ 430
[1]
Docket No. 277-86
Addition to Tax
Year
Deficiency
Sec. 6653(b) 1981
$ 360,633
$ 180,317
Docket No. 34875-87
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
$ 11,611
$ 581
[1]
$ 2,903
Docket No. 34923-87
Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
$ 137,780.00
$ 6,889.00
[1]
$ 34,445.00
1984
1,299.25
1,299.25
[1]
6,496.25
Concessions have been made by the parties. The only issue remaining for decision is whether respondent improperly and impermissibly discriminated against petitioners John E. Hayes, Jr., and Cheryl S. Hayes by not offering them the same settlement offer that was offered to other investors in two tax shelters in which petitioner John E. Hayes, Jr., participated. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. *495 Petitioners John E. Hayes, Jr., and Cheryl S. Hayes resided in, and Hayes and Associates, Inc., had its principal office located in Atlanta, Georgia, when they filed their petitions in these consolidated cases. John E. Hayes, Jr. (petitioner), was graduated from Chattanooga City High School and from September 1959 to December 1964, attended Georgia Tech, where he received a B.S. degree in industrial management. After graduating from Georgia Tech, petitioner was employed by the First National Bank of Atlanta, Georgia, where he worked as an administrative assistant to several trust officers of the bank. As an administrative assistant, he learned the trust operations of the bank. In November 1969, after having been discharged from the U.S. Navy, petitioner was employed in California, with Shearson, Hammill & Co., where he was a stockbroker trainee. He registered as a commodities broker with Shearson, Hammill in 1970. While at Shearson, Hammill petitioner took the commodity examination administered by the Chicago Board of Trade and obtained a passing grade of B+. He was also registered as a representative on the New York Stock Exchange and the American Stock Exchange. Petitioner *496 engaged in commodity trades with the London broker Rudolf Wolff & Co. on his own account in 1975. He also traded on the London silver market in 1976 with the London broker Rothmetal. Petitioner did business under the name Southern California Metals. He left Shearson, Hammill and went to work for Loeb Rhodes. In February 1976, petitioner left Loeb Rhodes and went to work under an employment contract with William Irwin in California in a company known as Irwin Management Co., later called Irwin Trading Co.
William Irwin supplied petitioner with various materials to be used to make presentations to potential clients, including a copy of Irwin Trading Company's Federal income tax return for the taxable year ended August 31, 1975, and copies of documents showing transactions done for Irwin Trading Co., in the cash and carry commodities market that generated a tax shelter loss which was claimed on the return. Petitioner also was made a vice president of Irwin Trading Co., during 1976. On or about June 21, 1976, petitioner opened an office in Atlanta to obtain clients to engage in commodities trading with William Irwin's firm. In 1976, Page Boyd and his Atlanta law firm prepared *497 10 limited partnership agreements and 10 limited partnership subscription agreements for petitioner. The 10 limited partnerships were known as Hayes Associates I through Hayes Associates X. The documents were filed for petitioner with the Clerk of the Superior Court of Fulton County, Georgia. Petitioner marketed the Hayes Associates limited partnerships as a 10-to-1 writeoff for tax purposes. The Hayes Associates limited partnerships reported ordinary losses and capital gains from commodities traded in 1976. Those alleged trades were with Irwin Trading GmbH, a corporation formed by William Irwin and domiciled in Frankfurt, Germany. The Hayes Associates limited partnerships also reported ordinary losses and capital gains from commodities traded in 1977. Those alleged trades were with Les Diablerets Holdings, a brokerage firm established by Fred Thom in Switzerland to trade in commodities. The ordinary losses and capital gains reported by the partnerships were substantially equal in amounts; the tax shelter was used to convert ordinary income into capital gain. In addition to the Hayes Associates limited partnerships, petitioner also marketed a tax shelter that offered a 5-to-1 *498 writeoff for tax purposes. Under this tax shelter, a grantor trust was established in which a client would invest. Petitioner was the trustee of each grantor trust. Each grantor trust then joined a foreign partnership. In 1976, the foreign partnership was Irwin Eurotrade. In 1977 and subsequent years, Fred Thom was the general partner of the various foreign partnerships which the grantor trusts joined. Most of petitioner's clients were in grantor trust tax shelters. In or about 1976, petitioner established his own grantor trust, the John Hayes Trust. That trust then invested with an offshore broker/dealer in gold cash-and-carry commodities transactions known as Intertrade in which Fred Thom was the general partner. Petitioner's trust then became a general partner in Intertrade. In 1976, petitioner also had a grantor trust that was a partner in Irwin Eurotrade. From 1977 through 1981, petitioner invested a total of $ 200,000 in various grantor trusts and Hayes Associates limited partnerships. After auditing petitioners' Federal income tax returns, respondent determined in the statutory notices of deficiency for the years 1976 through 1983, inter alia, that the deductions, *499 gains, and losses reported by them regarding petitioner's alleged grantor trusts could not be recognized because it had not been shown that they were actually incurred or that they were incurred as claimed. It was further determined that the form of all of the transactions relating to the trusts was a sham. Respondent also determined that the deductions, gains, and losses reported regarding petitioner's alleged commodity trading account and his interest in alleged commodity trading transacted through various Hayes Associates limited partnerships and related entities could not be recognized because it had not been shown that they were actually incurred or that they were incurred as claimed. Respondent further determined that the form of all the transactions relating to the Hayes Associates limited partnerships, including the foreign commodity dealings both individually and through the limited partnerships, was a sham. Respondent offered a settlement to the investors in the commodities tax shelters in which petitioner was the trustee of their grantor trusts and in which he was the managing general partner of one of the Hayes Associates limited partnerships I through X. The settlement *500 provided that the investors would be allowed an ordinary deduction for their net cash-out-of-pocket investment, plus trustee fees, in lieu of all claimed income, gains, and losses from the tax shelters. In addition, respondent offered to concede additions to tax, including the section 6621(c) increased interest rate on deficiencies. The deduction allowance was to be telescoped into the initial year of each investor's participation; that is, if an investor made an investment in more than 1 year, then the total cash out-of-pocket was allowed as a deduction in the first investment year. Respondent did not authorize her agents to make the offer to petitioner but restricted the offer to the other investors. Petitioners John E. Hayes Jr., and Cheryl S. Hayes argue that they are entitled to receive the same settlement offer that was made to the other investors in the Hayes Associated limited partnerships and the grantor trusts, as a matter of equity. Petitioner analogizes his role, which he says other investors asked him to assume, to that of an individual driving his vehicle with a specific destination in mind: In starting his journey, others may hear of his destination and wish *501 to share the ride. By accepting their entry on his personal journey, nothing is added but additional baggage on an already planned trip. That does not redefine the driver's role; he remains what he initially set out to be: a driver. The same is true with respect to petitioner. He was an investor with a specific economic destination and the economic vehicle to reach that destination. Others heard of his journey and asked him for directions. He obliged them. Everyone then became travelers on that same trip petitioner previously planned. All were investors with the same vehicle and destination, and should all be granted the same treatment.
To an extent, we agree with petitioner. He did take the "other investors" for a ride. Petitioner cites, among other cases, Hooper v. Bernalillo County Assessor, 472 U.S. 612 (1985), and Zobel v. Williams, 457 U.S. 55 (1982), in support of his argument that respondent violated the equal protection principles of the 5th and 14th Amendments to the Constitution by arbitrarily and unjustly discriminating against petitioners by not extending to them the same settlement offer made *502 to "other investors". Hooper and Zobel are clearly inapposite. Hooper involved a New Mexico statute that exempted from New Mexico's property tax $ 2,000 of the taxable value of property of honorably discharged veterans who served on active duty during the Vietnam War for at least 90 consecutive days. The statute also provided, however, that the exemption was limited to veterans who were New Mexico residents before May 8, 1976. Alvin D. Hooper otherwise qualified for the exemption except that he did not become a resident of New Mexico until 1981. He applied for the exemption in 1983, and it was denied to him. The Supreme Court stated in Hooper, 472 U.S. at 618: When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Generally, a law will survive that scrutiny if the distinction rationally furthers a legitimate state purpose. * * * [Fn. ref. omitted.]
In finding that the statute violated the guarantees of the Equal Protection Clause of the 14th Amendment, the Supreme Court said, 472 U.S. at 622-623: *503 The New Mexico statute, by singling out previous residents for the tax exemption, rewards only those citizens for their "past contributions" toward our Nation's military effort in Vietnam. * * * The State may not favor established residents over new residents based on the view that the State may take care of "its own," if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's "own" and may not be discriminated against solely on the basis of their arrival in the State after May 8, 1976. * * *
In Zobel, Alaska amended its constitution to establish a fund into which the State was to deposit at least 25 percent of its mineral income each year. In 1980, the State legislature enacted a dividend program to pay on a yearly basis a portion of the fund's earnings directly to the State's adult residents. Each adult resident was to receive one dividend unit for each year of residency after 1959, the first year of Alaska's statehood. The Zobels, who were residents of Alaska beginning in 1978, challenged the statute on the ground, inter alia, that it violated their right to equal protection under the law. In holding *504 that the Alaska dividend distribution plan violated the Equal Protection Clause of the 14th Amendment, the Supreme Court stated in Zobel, 457 U.S. at 65: The only apparent justification for the retrospective aspect of the program, "favoring established residents over new residents," is constitutionally unacceptable. * * *
Both Hooper and Zobel concerned the distributions of benefits created by statute to bona fide residents of the States of New Mexico and Alaska, respectively. By contrast, in this case there are no benefits created by statute that are being distributed. Respondent's settlement offer was not dictated by law but was an effort to reach agreed settlements of a large number of cases efficiently. Avers v. Commissioner, T.C. Memo. 1988-176. In Penn-Field Indus., Inc. v. Commissioner, 74 T.C. 720 (1980), the taxpayer filed a motion to compel the Commissioner to answer interrogatories relating to its allegation of invidious discrimination by the Commissioner in, inter alia, the settlement of a particular category of cases. We there noted, id. at 722-723: *505 The Fifth Amendment to the Constitution protects against the deprivation of life, liberty, or property without due process of law. The due process clause has also been held to provide protection against Federal discriminatory action "so unjustifiable as to be violative of due process." Bolling v. Sharpe, 347 U.S. 497-499 (1954); In re Ward v. Commissioner, 608 F.2d 599 (5th Cir. 1980), affg. T.C. Memo. 1979-39. However, the Supreme Court has held that the conscious exercise of some selectivity in enforcement is not in itself a Federal constitutional violation of due process or equal protection where the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Oyler v. Boles, 368 U.S. 448 (1962).
Respondent contends that she did not improperly and impermissibly discriminate against petitioners when she did not offer them the same settlement as she offered to others who invested in the two tax shelters promoted by petitioner. Respondent posits that petitioner created, promoted, operated *506 and profited from the two abusive tax shelters which were determined to be based on sham transactions. Respondent contends that she had a rational reason for the different treatment accorded petitioner and it was in furtherance of a legitimate Government interest, citing Vance v. Bradley, 440 U.S. 93, 97 (1979). Respondent further determined that the two tax shelters formed by petitioner (Hayes Associates I through X and the various grantor trusts) were just like the abusive tax shelters in which petitioner was involved when he worked with William Irwin. We agree with respondent. In Amsler v. Commissioner, T.C. Memo. 1991-443, we examined Irwin Management's commodity trading transactions during 1976-79. The following are excerpts from that opinion: [3]
In 1973 or 1974, Irwin formed a wholly owned company in California called Irwin Management, Inc. (Irwin Management, later called Irwin Trading). * * * Around February 1976, Joan Wilhelm Rose (Rose) began working for Irwin at Irwin Management in California. Rose took over all bookkeeping duties, opened all the mail, made all of the bank deposits, and generally performed *507 all of the Administrative duties for Irwin Management in California. * * * The first clients for Irwin Management were obtained in May of 1976. Hayes recruited the clients during this time. He was an outside salesman who paid his own expenses and received a commission. Irwin brought in a few of the clients while Rose was employed by him. * * * Following her usual procedure, from the worksheet, Rose would generate a cash commodity agreement which was an agreement between the client and Irwin Management showing the amount of money received from an investor and acceptance of such amount. Then a "management advisory agreement" was executed between the investor and Irwin Management generally establishing that Irwin Management would advise the investor on which commodities to purchase. Irwin Management then would generate a confirmation to purchase gold for an investor at a specified price. No documentation was received from any foreign exchanges or commodity exchanges that would substantiate the confirmations to buy gold. Next, a confirmation to sell gold would be generated and again no documentation to substantiate ever was received. The next document generated was a nonrecourse *508 note for the total purchase price of the gold. Then a security agreement was executed listing gold certificates, contractual rights and other evidence of rights, and the ownership of the gold bullion, as well as accounts and contractual rights to the cash forward sale of gold bullion, as collateral for financing the gold. Rose never saw a gold certificate. A "Power of Attorney and Hold Harmless Agreement" then was executed between Irwin Management and the investor. Irwin Trading GmbH was incorporated, pursuant to Irwin's instructions on September 10, 1976, and was domiciled in Frankfurt, Germany. Rose typed, or supervised the typing, of all correspondence and documents for Irwin Trading GmbH from Irwin Management in California. She prepared statements of account and confirmations from Irwin Trading GmbH to Eurotrade. She also prepared final settlement documents from Irwin Trading GmbH to Eurotrade which indicated gains or losses from buying and subsequently selling silver. She also prepared notes from First National Commerce and Finance Corporation (First National). First National supposedly was the bank which financed the purchase of gold and silver by Eurotrade and the *509 other foreign partnerships. * * * Eurotrade was formed on October 15, 1975, with its domicile in Vaduz, Liechtenstein. The Eurotrade "Partnership Agreement" states that two partners, Irwin and Diane L. Maddox, each made original capital contributions to Eurotrade in the amount of $ 10,000. The purpose of Eurotrade, as stated in the partnership agreement, was to "act as a buyer, seller or in any other capacity on the commodity markets of any kind throughout the world, such as the cash markets, cash forward markets, futures markets or option markets." Effective November 1, 1976, John Hayes (Hayes) was admitted as an additional partner in Eurotrade. Eurotrade did not engage in any commodity transactions, including the buying and selling of any gold or silver, at any time during the years in issue. [Emphasis supplied. [4]]
*510 We found in Amsler that all the transactions in issue were factual shams. The evidence in this case convinces us that petitioner's commodities trading for Hayes Associates I through X and his grantor trust tax shelter paralleled Irwin's abusive tax shelter practices. At trial, petitioner professed to having been a passive investor in Hayes Associates I through X and the grantor trusts and asserted that he was as much a victim of the sham transactions as were the "other investors" with whom respondent settled. He seeks to disassociate himself from Fred Thom, claiming that all of the sham tradings for Hayes Associates I through X and the grantor trusts were conducted by and attributable to Fred Thom. We find petitioner to have been a singularly noncredible witness. His testimony at trial was selective, evasive, and contradictory. According to petitioner, Fred Thom was the culprit responsible for any sham transactions pertaining to Hayes Associates I through X and the grantor trusts. For petitioner to meet his burden of proof, more is required than his unsubstantiated, unverified, undocumented testimony. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). *511 We are particularly mindful of petitioner's failure at trial to call any witness to corroborate his self-serving testimony. Fred Thom was notable by his absence. While his absence might be understandable if properly explained, the failure of petitioner to take his deposition is telling. As we stated in Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947): The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. * * *
In short, petitioner was the creator and promoter of the shams in which others invested, and he should not be permitted to benefit in any way from his chicanery. Therefore, we hold that respondent's refusal to extend to petitioner the settlement offer made to other investors in the tax shelters created by him was eminently reasonable. To reflect the foregoing and the concessions of the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: John E. Hayes, Jr. and Cheryl S. Hayes, docket Nos. 26776-82, 39901-85, 277-86, and 34875-87; and Hayes & Associates, Inc., docket Nos. 22632-82, 44701-85, 30613-86, and 34923-87.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50% of the interest due on the underpayments due to negligence.↩
1. 50% of the interest due on the underpayments due to negligence.↩
3. All references to "Hayes" are to petitioner John E. Hayes, Jr.↩
4. The years involved in Amsler v. Commissioner, T.C. Memo. 1991-443↩, were 1976, 1977, 1978, and 1979.