WALLACH, Circuit Judge,
concurring.
I agree the district court correctly dismissed the challenge of Schaeffler Group USA, Inc. (“Schaeffler”), under the Fifth Amendment’s Due Process Clause, to the Continued Dumping and Subsidy Offset Act of 2000 (“CDSOA”), Pub.L. No. 106-387, §§ 1001-03, 114 Stat. 1549, repealed by Deficit Reduction Act of 2005, Pub.L. *1365 No. 109-171, § 7601(a), 120 Stat. 4, 154 (2006). This court’s precedent requires that outcome. See SKF USA, Inc. v. U.S. Customs & Border Prot., 556 F.3d 1337, 1360 (Fed.Cir.2009) (holding the petition support requirement of the CDSOA was constitutional under both the First Amendment and Equal Protection Clause because it “furthers the government’s substantial interest in enforcing the trade laws”). I write separately because, in my view, SKF incorrectly concluded the retroactive application of the CDSOA rationally furthers a legitimate government interest, and SKF should therefore be overruled by this court sitting en banc. See Fed. Cir. R. 35(a)(1) (“[OJnly the court en banc may overrule a binding precedent.”).
I. Under the Due Process Clause, the RETROACTIVE APPLICATION OF A STATute must be Supported by a Legitimate Purpose furthered by Rational Means
The Constitution’s Due Process Clause provides that “[n]o person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const. amend. V. The Due Process Clause guarantees both “substantive due process” and “procedural due process.” United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Only substantive due process is at issue in this appeal.
The Supreme Court has explained that the guarantee of substantive due process prevents the government from engaging in conduct, such as the enactment of legislation, “that ‘shocks the conscience,’ or interferes with rights ‘implicit in the concept of ordered liberty.’ ” Id. (quoting Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952); Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). Where no fundamental right is at issue, legitimate government action will normally be upheld so long as there is a rational basis for it. See Lawrence v. Texas, 539 U.S. 558, 588, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (Scalia, J., dissenting) (“[OJnly fundamental rights which are deeply rooted in this Nation’s history and tradition qualify for anything other than rational-basis scrutiny under the doctrine of substantive due process.”) (internal quotation marks omitted). Specifically, “in the field of national economic policy,” the Court has held the Due Process Clause will not serve to invalidate a retroactive statute so long as “the retroactive application of [the] statute is supported by a legitimate legislative purpose furthered by rational means.” Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (emphases added).
II. The CDSOA’S Retroactive Applioation is not Supported by a Legitimate Legislative Purpose furthered by Rational Means A. Stated Legislative Purpose
When Congress enacted the CDSOA in 2000, it explained the purpose of the legislation in a section titled “Findings of Congress”:
Congress makes the following findings:
(1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.
(2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost, through the false market signals.
(3) The continued dumping or subsidization of imported products after the issu- *1366 anee of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.
(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American, farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.
(5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.
Pub.L. No. 106-387, § 1002, 114 Stat. 1549 (2000) (codified at 19 U.S.C. § 1675c (2000)) (emphases added) (“CDSOA Findings”). These findings indicate the stated purpose of the CDSOA is to “strengthen[ ]” the trade laws so they may achieve their “remedial purpose,” CDSOA Findings ¶ 5, and that the purpose of United States unfair trade laws generally is “the restoration of conditions of fair trade,” id. ¶ 2; see also Gov’t Accountability Office, GAO-05-979, Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act 3 (2005), available at http://www.gao.gov/new.items/d05979.pdf (explaining that “in passing CDSOA, Congress aimed to strengthen the remedial nature of U.S. trade laws”).
To the extent CDSOA distributions “re-stor[e] ... conditions of fair trade,” CDSOA Findings ¶ 2, they do so differently than the antidumping and countervailing duties from which they are drawn. Anti-dumping duties by statute must be imposed “in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise.” 19 U.S.C. § 1673; see also 19 U.S.C. § 1671(a) (Countervailing duties are to be imposed in an amount “equal to the amount of the net countervailable subsidy.”). By imposing a duty in an amount that offsets unlawfully low prices, these orders serve to “neutralize[ ]” the effects of dumping or actionable subsidies. See CDSOA Findings ¶ 1. Because they apply generally to imported goods that compete with domestically produced goods, the duties serve to remedy harm to the domestic industry as a whole.
By contrast, CDSOA subsidies are drawn from the antidumping duties collected by United States Customs- and Border Protection and redistributed to only those members of industry who supported the antidumping petition. See SKF, 556 F.3d at 1341-42; id. at 1351 (The CDSOA “did not compensate all injured domestic producers.”). Because antidumping and countervailing duties already help to restore conditions of fair trade by raising the price of imported goods to their' fair value, an argument could be made that CDSOA distributions do not promote the restoration of fair trade but instead constitute a double remedy, an issue not addressed by the SKF court.[1]
*1367 There is little doubt that restoring conditions of fair trade is a legitimate government interest. However, even assuming the CDSOA as a whole promotes this interest, to survive substantive due process scrutiny the legitimate interest must be rationally furthered not only by the legislation as a whole, but also by the retroactive portion of the legislation. Gray, 467 U.S. at 730, 104 S.Ct. 2709 (“ ‘The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.’ ”) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)); Landgraf v. USI Film Prods., 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (“[A] justification sufficient to validate a statute’s prospective application under the [Due Process] Clause may not suffice to warrant its retroactive application.”) (internal quotation marks and citation omitted).
The problem with the CDSOA is that the asserted explanation of how the retroactive portion of the legislation rationally furthers the government’s legitimate interest in restoring conditions of fair trade borders on the frivolous. In SKF, the government asserted the retroactive aspect of the CDSOA promotes the restoration of fair trade by compensating those who were injured by dumping, and petition support is merely a surrogate for injury. See SKF, 556 F.3d at 1351. In the government’s view, those members of the domestic industry that supported the petition are assumed to have suffered the greatest injury. Id. Although the SKF court upheld the law and agreed the CDSOA as a whole “was designed to compensate domestic producers injured by dumping,” the court rejected the government’s argument that the petition support requirement served only to identify those suffering the greatest injury, finding this rationale “simply implausible in light of ... the absence of any evidence in the legislative history that the support requirement was designed as a proxy for injury, and the availability of far more direct and accurate methods of measuring injury.” Id. at 1350, 1351.
The restoration of conditions of fair trade might have been rationally furthered by the retroactive portion of the CDSOA had Congress chosen to either compensate all injured industry members or allocate funds in some colorable relation to injury. However, petition support as a proxy for injury is far too inaccurate a measure if indeed it relates to injury at all. As explained by the dissent in SKF, “[A] domestic producer might oppose a petition to protect business relationships in foreign countries having nothing to do with the domestic market, or it might decline to support a petition for fear of retaliation in export markets.” SKF, 556 F.3d at 1374 (Linn, J., dissenting). Indeed, although not controlling on the issue of congressional intent, id. at 1352, the United States took the position before the World Trade Organization that “[t]he amount of the [CDSOA] distributions have [sic] nothing to do with the injury to the domestic producer or the recovery of ‘damages’ by the domestic producer;” World Trade Organization, Report of the Panel, United States—Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/R, WT/ *1368 DS234/R ¶ 4.502 (Sept. 16, 2002), aff 'd, Appellate Body Report (emphasis added).
While “under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means,” Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 639, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), an inappropriate means must, at some point, become unconstitutionally arbitrary, Washington v. Glucksberg, 521 U.S. 702, 735, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (finding the means employed by the government to be “at least reasonably related” to “unquestionably important and legitimate” interests); see also Reno v. Flores, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (The Due Process Clause “demands no more than a reasonable fit between government purpose ... and the means chosen to advance that purpose.”) (internal quotation marks omitted) (emphasis added); cf. FCC v. Beach Comm’cns, Inc., 508 U.S. 307, 313-14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (stating that a statutory classification will be upheld “if there is any reasonably conceivable state of facts that could provide a rational basis for [it]”) (emphasis added); Nordlinger v. Hahn, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (“[T]he relationship of the classification to its goal” must not be “so attenuated as to render the distinction arbitrary or irrational.”). The due process right may not require that Congress’s actions reflect “mathematical exactitude” in fitting means to ends, City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), but the connection between means and ends must be grounded on something more than an unreasonable, hypothetical connection that the United States has expressly disclaimed in related proceedings.
Moreover, the problem the government was facing was not one that “may justify, if ... not require, rough accommodations.” Heller v. Doe, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 57 L.Ed. 730 (1913)). To the extent Congress’s purpose was to restore conditions of fair trade by neutralizing the effects of injurious dumping and actionable subsidies, “far more direct and accurate methods of measuring injury” were readily available to it. SKF, 556 F.3d at 1351. The present case is nothing like cases upholding acts of Congress as rationally related to a legitimate government interest despite the fact that the law was “not made with mathematical nicety.” City of Dallas v. Stanglin, 490 U.S. 19, 21, 26, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (internal quotation marks and citation omitted) (upholding a law restricting admission to certain dance halls to persons between the ages of fourteen and eighteen to protect them from “detrimental influences of older teenagers and young adults”); Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (upholding a law imposing mandatory retirement at age sixty for certain employees but not others); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (upholding a law limiting welfare benefits to $250 per month regardless of family size).
Instead, it bears a closer resemblance to cases such as Plyler v. Doe, in which the Supreme Court found irrational a law that purportedly furthered a state’s interest in protecting itself from an influx of illegal immigrants by denying a free education to undocumented children. 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The Court explained that because “[t]he dominant incentive for illegal entry into the State of Texas is the availability of employment,” charging tuition to undocumented *1369 children “constitutes a ludicrously ineffectual attempt to stem the tide of illegal immigration, at least when compared with the alternative of prohibiting the employment of illegal aliens.” Id. at 228-29, 102 S.Ct. 2882 (internal quotation marks and citation omitted).
B. Other Conceivable Purposes
Considering the equal protection guarantees of the Fifth Amendment’s Due Process Clause, the Supreme Court has explained “it is entirely irrelevant for constitutional purposes whether the legislature was actually motivated by the conceived reason for the challenged distinction.” Beach Comm’cns, 508 U.S. at 315, 113 S.Ct. 2096; see also id. at 313, 113 S.Ct. 2096 (Legislation will be upheld “if there is any reasonably conceivable state of facts that could provide a rational basis” for it.). To the extent this principle applies to the substantive due process context, other conceivable government interests must be considered.[2] See, e.g., Crider v. Bd. of Cnty. Comm’rs, 246 F.3d 1285, 1290 (10th Cir.2001) (stating, in the context of a substantive due process challenge, that “under rational basis analysis, we look only to whether a reasonably conceivable rational basis exists”) (internal quotation marks and citation omitted); 37712, Inc. v. Ohio Dep’t of Liquor Control, 113 F.3d 614, 620 (6th Cir.1997) (“[I]f any conceivable legitimate governmental interest supports the contested ordinance, that measure is not ‘arbitrary and capricious’ and hence cannot offend substantive due process norms.”); California v. FCC, 905 F.2d 1217, 1238 (9th Cir.1990) (“[UJnder the due process and equal protection clauses,” agency action will be upheld “if it has any conceivable rational basis.”).
Although the “restoration of conditions of fair trade” by remedying unfair trade practices and neutralizing illegal dumping or subsidies may have been the stated purpose of Congress in enacting the CDSOA, it is not the only conceivable legitimate government interest that may be served by the CDSOA. The SKF court, for example, framed the legitimate interest somewhat differently, stating “the purpose of the [CDSOA’s] limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings.” SKF, 556 F.3d at 1352 (emphases added). The court explained that “by rewarding injured parties who assist in this enforcement,” the CDSOA “directly advances the government’s substantial interest in trade law enforcement.” Id. at 1355 (emphasis added).
This analysis conflates rewarding past action with incentivizing present or future action, as reflected in the inconsistent tenses used by the SKF court in its reasoning. Although the creation of a prospective incentive that rewards those who assist by providing petition support might be rationally expected to further the goal of enforcing trade policy, rewarding the pre-enactment choice of those who assisted by supporting a petition is gratuitous and unrelated to this goal, and thus arbitrary within the meaning of the Due Process Clause.
*1370 The error in the SKF court’s reasoning is reflected in its comparison of CDSOA distributions to payments in qui tam or whistleblower actions and to the awarding of attorney fees to successful plaintiffs “who vindicate government policy” such as “in actions under Title VII.” Id. at 1356. Payments in these actions are provided to relators, whistleblowers, or litigants who know of the reward in advance. They are therefore analogous to the prospective payments available under the CDSOA. However, the payments in these comparison actions are .unlike the retroactive CDSOA distributions because the former operate as incentives to induce future activity that furthers the government’s legitimate interest. By contrast, the ex post provision of a reward for activity already undertaken cannot in any meaningful way further the government’s interest in enforcement of the trade laws.
To the extent SKF held the reward itself (as distinct from any object sought to be achieved via the provision of the reward) is a legitimate purpose, see SKF, 556 F.3d. at 1352 (“[T]he purpose ... was to reward.”), the Supreme Court has foreclosed this theory, see Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (rejecting the argument that a bare reward that operates retrospectively and is unrelated to any present or future incentive effect rationally furthers a legitimate state interest). In Zobel, the Court considered a 1980 Alaska law that distributed state oil revenues to residents in proportion to “each year of residency [in Alaska] subsequent to 1959.” Id. at 57, 102 S.Ct. 2309. Among the stated purposes of the legislation was “to encourage persons to maintain their residence in Alaska and to reduce population turnover in the state.” Id. at 61 n. 7, 102 S.Ct. 2309. In distinguishing the possible prospective incentive (based on the duration of residency following enactment) from the retroactive reward (based on the duration of residency prior to enactment), the Court first held there was no rational connection between the retroactive reward and the asserted interest:
Assuming, arguendo, that granting increased dividend benefits for each year of continued Alaska- residence might give some residents an incentive to stay in the State in order to reap increased dividend benefits in the future, the State’s interest is not in any way served by granting greater dividends to persons for their residency during the 21 years prior to the enactment.
Id. at 62, 102 S.Ct. 2309 (emphasis added).
The Court then considered whether the reward itself, irrespective of any relationship to a present or future incentive, could constitute a legitimate interest. Citing precedent, the Court concluded that “[t]he last of the State’s objectives — to reward citizens for past contributions” “is not a legitimate state purpose.” Id. at 63, 102 S.Ct. 2309. In a concurring opinion, Justice O’Connor explained that “[t]he Court’s opinion ... insures that any governmental program depending upon a ‘past contributions’ rationale will violate the Equal Protection Clause [because it does not further a legitimate purpose].”[3] Id. at 73, 102 S.Ct. 2309.
*1371 Cases cited by the majority where courts have upheld retroactive rewards (or the imposition of retroactive liability) as rationally related to a legitimate government interest are distinguishable. In Commonwealth Edison Co. v. United States, this court upheld as constitutionally permissible a portion of the Energy Policy Act of 1992 that retroactively imposed “special monetary assessments on domestic utilities for the remediation of environmentally contaminated uranium processing facilities owned by the United States.” 271 F.3d 1327, 1329 (Fed.Cir.2001). The monetary assessments rationally furthered the legitimate interest of environmental cleanup. In addition, “Congress reasonably concluded that the utilities ... contributed to the contamination” and the “utilities could have reasonably expected to be liable for a share of the remediation costs.” Id. at 1330; see also id. at 1332 (“[Tjhere is no question that the processing of the utilities’ uranium caused ... contamination....”). In contrast to the undoubted environmental harm caused by the past actions of the utilities in Commonwealth Edison, no harm to trade law enforcement resulted from the past nonsupport of Schaeffler in any case where CDSOA distributions are at issue, since those distributions will be made only where an antidumping petition was successful notwithstanding Schaeffler’s failure to support it.
In Turner Elkhom, coal mine operators challenged the constitutionality of the Federal Coal Mine Health and Safety Act of 1969, which imposed potential liability on the operators for black lung disease “caused by long-term inhalation of coal dust.” 428 U.S. at 6, 96 S.Ct. 2882. The operators argued the law “spread[] costs in an arbitrary and irrational manner” that “[gave] an unfair competitive advantage to new entrants into the industry.” Id. at 18, 96 S.Ct. 2882. The Court held it was “for Congress to choose” how to allocate the financial burden and that it was sufficient that the law “approache[d] the problem of cost spreading rationally.” Id. at 18-19, 96 S.Ct. 2882. Unlike the law at issue in Turner Elkhorn, the purported rationality of the CDSOA is not based on Congress’s decision to impose liability on “those who have profited from the fruits of’ activities that contributed to a societal problem. Id. at 18, 96 S.Ct. 2882. There is nothing in the record demonstrating harm, caused by Schaeffler’s nonsupport, that the retroactive aspect of the CDSOA remedies.
*1372 In Gray, Congress imposed retroactive “withdrawal liability” on employers who withdrew from a multi-employer pension plan beginning during the approximately five-month period before the statute was enacted into law. 467 U.S. at 725, 104 S.Ct. 2709. Unlike the present case, the retroactive provisions in Gray were intended to address Congress’s concern “that employers would have an even greater incentive to withdraw if they knew that legislation to impose more burdensome liability on withdrawing employers was being considered.” Id. at 730-31, 104 S.Ct. 2709. That is, the retroactivity was intended to induce employers to take the present action (or inaction) of remaining within the multi-employer pension plan, during the pendency of the legislation,' in order to further the government’s underlying interest in “ensuring] that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.” Id. at 720, 104 S.Ct. 2709.
In contrast to Gray, in which a present incentive rationally furthered a legitimate legislative purpose, the retroactive portion of the CDSOA creates no present incentive to support government enforcement of the trade laws. Moreover, unlike the disadvantaged groups in Commonwealth Edison, Turner Elkhom, and Gray, the group disadvantaged by the retroactive portion of the legislation in the present matter did not cause the harm remedied by the retroactive application of the legislation. In instances where CDSOA distributions are made, it is not clear there is any petition-related harm to remedy.
Given the context of the CDSOA, which diverges substantially from past eases in which government action has been upheld under rational basis scrutiny, this court must remain vigilant to the possibility that Congress’s “responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals” or of favoritism toward preferred groups. Landgraf, 511 U.S. at 266, 114 S.Ct. 1483; see also E. Enters. v. Apfel, 524 U.S. 498, 549, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring in the judgment and dissenting in part) (“Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them.”); United States v. Carlton, 512 U.S. 26, 32, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (upholding a retroactive law where “[tjhere [was] no plausible contention that [Congress] acted with an improper motive”).
According to the Government Accountability Office (“GAO”), “[f]ive companies, including [the] Timken [Company (“Timken”), MPB Corporation (a subsidiary of Timken), and the Torrington Company (acquired by Timken in 2003) ], received nearly half of the total [CDSOA] payments, or about $486 million,” while the remaining half was distributed .among 765 beneficiaries. See GAO-05-979, at 29 & n. 39.[4] Since the GAO report, over $100 million in additional CDSOA funds were received by Timken alone. See The Timken Co., An *1373 nual Report at 88 (Form 10-K) (Dec. 31, 2014) ($112.8 million in CDSOA distributions received for years 2006 through 2010). It is a simple matter to determine which companies “checked the box” in support of a past petition, and this case therefore presents a situation where a retroactive statute “ ‘may be passed with an exact knowledge of who will benefit from it.’” Landgraf, 511 U.S. at 267 n. 20, 114 S.Ct. 1483 (quoting Charles B. Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L.Rev. 692, 693 (1960)).
Because the SKF court incorrectly applied the rational basis test to the facts before it, that case should be overruled en banc.

. The extent to which the CDSOA promotes fair trade was called into question by the report of the World Trade Organization's Appellate Body, which found the CDSOA “inconsistent with certain [United States treaty obligations under] the Anti-Dumping Agreement and the [Agreement on Subsidies and Countervailing Measures ].” World Trade Organization, Report of the Appellate Body, United States — Continued Dumping and Subsidy Offset Act of 2000, WT/DS234/AB/R ¶ 318(b) (Jan. 16, 2003) (“Appellate Body Report”); see also Giorgio Foods, Inc. v. United States, No. 2013-1304, 785 F.3d 595, 611, 2015 WL 1865702, at *14 (Fed.Cir. Apr. 24, 2015) (Reyna, J., dissenting) ("[P]etition support expressions, in [U.S. International Trade Commission] questionnaire responses, do not *1367 further the enforcement of antidumping laws.”). The Appellate Body stated that "[ojffset payments to ‘affected domestic producers’ when combined with ' anti-dumping duties operate to impose a double remedy in respect of dumped goods.” Appellate Body Report ¶ 43. The CDSOA was repealed after the Appellate Body's ruling. Deficit Reduction Act of 2005, Pub.L. No. 109-171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective Oct. 1, 2007).

. It is not clear other conceivable purposes must be considered where, as here, the legislature has expressly stated the purposes of the law. See Zobel v. Williams, 457 U.S. 55, 61 n. 7, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (The law's "purposes were enumerated in the first section of the Act creating the dividend distribution plan.... Thus we need not speculate as to the objectives of the legislature."). However, even if other conceivable reasons are considered, as they have been by the SKF court and the majority today, the retroactive portion of the CDSOA does not rationally further a legitimate government interest.

. In a related appeal, this court states "a legislative purpose to reward particular conduct is valid for its own sake, not just because it may have the effect of incentivizing particular conduct.” Pat Huval Rest. & Oyster Bar, Inc. v. Int’l Trade Comm’n, No. 2012-1250, 785 F.3d 638, 645, 2015 WL 2108514, at *6 (Fed.Cir. May 7, 2015). By way of example, it explains that “a legislative program retroactively providing benefits to veterans is justified as a reward to the veterans for their service; its rationality does not depend on whether the program induces others to join the military.” Id. The analogy fails. The *1371 veteran has a reasonable expectation that his services will be rewarded, as do employees generally. Until the CDSOA, there was no similar expectation that petition support would be rewarded, making the retroactive change capricious. This distinction is consonant with Zobel, in which the residents of Alaska could not have known, years before the enactment of the retroactive legislation, that a benefit would be forthcoming. Moreover, concerns of legislative favoritism are significantly diminished where benefits are dispersed evenly and widely across large numbers of individuals, rather than concentrated in a small number of large corporations. See infra note 4 and accompanying text.
The attempt in Pat Huval to distinguish Zobel collides with the latter’s express language. Compare Pat Huval, 785 F.3d at 644, 2015 WL 2108514, at *5 ("Nothing in Zobel suggests that its analysis is so broad as to render illegitimate any legislative action designed to reward conduct that preceded the enactment of the legislation.”) (emphases added), with Zobel, 457 U.S. at 63, 102 S.Ct. 2309 (“The last of the State’s objectives — to reward citizens for past contributions ” "is not a legitimate state purpose.”) (emphases added), and id. at 73, 102 S.Ct. 2309 (O'Connor, J., concurring) ("The Court's opinion ... insures that any governmental program depending upon a 'past contributions ’ rationale will violate the Equal Protection Clause” because, according to the Court, it lacks "any legitimacy.") (emphases added).

. It may not be coincidental that the original House and Senate sponsors of the CDSOA were Rep. Ralph Regula and Sen. Mike DeW-ine, both of Ohio, where Timken has been incorporated since 1904. See Statements on Introduced Bills and Joint Resolutions, 145 Cong. Rec. S497-01 (Jan. 19, 1999) (statement of Sen. Mike DeWine); The Timken Co., Annual Report (Form 10K) (Dec. 31, 1999). Rep. Nancy Johnson of Torrington, CT was a co-sponsor of the House bill. 146 Cong. Rec. H9708 (Oct. 11, 2000) (statement of Rep. Nancy Johnson).